## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KATHLEEN HERBERT

        *Plaintiff*,

   **v.**

THE PNC FINANCIAL SERVICES
GROUP, INC. AND AFFILIATES
LONG-TERM DISABILITY PLAN

        *Defendant*.

**CIVIL ACTION
NO. 14-04600**

PAPPERT, J.                                        **FEBRUARY 8, 2016**

### MEMORANDUM

      As an employee at PNC Bank, National Association ("PNC"), Kathleen Herbert

("Herbert") participated in the PNC Financial Services Group, Inc. And Affiliates Long-Term

Disability Plan (the "Plan" or "Defendant").  In 2012, Herbert sought long-term disability

("LTD") benefits under the Plan due to her chronic nausea and dizziness.  After conducting a

thorough review of her medical history, which included reviewing information submitted by five

of Herbert's treating physicians, PNC's plan administrator, Liberty Life Assurance Company of

Boston ("Liberty"), concluded that Herbert was not disabled pursuant to the terms of the Plan.

Central to Liberty's denial was the absence of any documentation demonstrating how Herbert's

condition prevented her from performing the functions of her job.  After unsuccessfully

appealing the decision to Liberty, Herbert filed this lawsuit contesting the denial of her LTD

benefits.

      Before the Court is Defendant's motion for summary judgment.  The Plan contends that

the decision to deny Herbert's benefits was based on a reasonable review of her claim file and

was neither arbitrary nor capricious.  Herbert argues that the claim file supports a finding that she

1

was disabled under the Plan, and that it was arbitrary and capricious for Liberty to require Herbert to provide evidence regarding the cause of her condition.  For the reasons set forth below, the Court grants Defendant's motion.

## I.

PNC hired Herbert on September 15, 2003 as a Branch Manager II.  (Def.'s Stmt. of Facts ("Def.'s SMF") ¶ 6.)  The essential functions of her job included management of the branch sales and service processes, customer satisfaction and retention, and employee development.  (*Id.*)  Herbert participated in the Plan, which is governed by the Employee Retirement Income Security Act of 1974 ("ERISA").  (*Id.* ¶¶ 1, 2.)  The Plan provides full-time, salaried employees who are out of work for longer than 91 days (the "Elimination Period") with LTD benefits of up to 60-percent of their base salary.  (*Id.* ¶ 2; Administrative Record ("AR") 777–78.)[1]

The Plan is fully self-funded.  (Def.'s SMF ¶ 3; AR 854–55.)  Benefits pursuant to the Plan are paid out of a separate trust, pre-established by an actuary for that purpose.  (AR 855.)  PNC holds no residual interest in the trust.  (*Id.*)  All money in the trust must be used for the exclusive benefit of participants or beneficiaries.  (*Id.*)  Pursuant to the terms of the Plan, PNC entered into an Administrative Services Only Agreement with Liberty.  (Def.'s SMF ¶ 4; AR 790–815.)  That agreement vested Liberty with discretionary authority to construe and interpret the terms of the Plan, and evaluate and decide all questions of eligibility and/or entitlement to LTD benefits.  (Def.'s SMF ¶ 4; AR 790–815.)  The Plan also provided that no decision made by Liberty shall be overturned unless it is arbitrary and capricious.  (Def.'s SMF ¶ 4; AR 790–815.)

---

[1]   The pages in the Administrative Record are Bates labeled with a prefix of "AR."  For ease of reference, the Court maintains this numbering scheme when citing to the record.

In order to qualify for LTD benefits under the Plan, an employee must demonstrate that she is "Disabled," which means that, for the first two years of her disability, she is "unable to perform the material or essential duties of [her] own occupation as it is normally performed in the national economy." (AR 778.) At all times, the employee must submit proof that she is Disabled and is receiving appropriate treatment under the continued and regular care of a physician. (AR 786.) The Plan provides that LTD claims will be denied, or LTD benefits will stop, if the participant fails to provide proof of a Disability, regular treatment with a physician, or appropriate treatment. (*Id.*)

### A.

On October 2, 2012, Herbert stopped working due to vertigo and nausea. (AR 15, 18–22.) Her alleged Date of Disability under the Plan was October 3, 2012, and her LTD effective date was January 2, 2013 based on the Plan's 91-day Elimination Period. (AR 15, 778.) On December 12, 2012, Liberty spoke with Herbert by telephone to gather information needed to begin its investigation to determine her eligibility for LTD benefits. (AR 5, 28–29.) Herbert represented that she was out of work from May 15, 2012 through September 17, 2012 due to breast reconstruction and revision surgery. (AR 5.) She told Liberty that after returning to work in September 2012, she began experiencing pain in her abdomen. (*Id.*) Herbert stated that she subsequently used four or five vacation days until she stopped working on October 2, 2012. (*Id.*) She reported symptoms including nausea, vomiting, dizziness, tingling in her arms, hands, back and feet and swelling in her breast. (*Id.*)

After speaking with Herbert, Liberty sent letters to the physicians with whom she met regarding her symptoms: gastroenterologist Dr. John Seedor; plastic surgeon Dr. Neal Topham; neurologist Dr. Aaron Dumont; family practitioner Dr. Cynthia Sacharok; and Ear, Nose and

Throat ("ENT") physician Dr. Joel Perloff.  (AR 5, 28.)  Liberty asked these physicians to submit Herbert's medical records for purposes of evaluating her LTD eligibility.  (*Id.*)  Liberty also wrote to Herbert requesting that she provide all medical information necessary to evaluate her eligibility and to demonstrate that she suffers from a Disability as defined by the Plan.  (AR 28–29.)  Liberty informed Herbert that if the requested information was not provided it would make an eligibility determination based on the information available in its file.  (*Id.*)

**B.**

In response to its requests for medical records, Drs. Seedor, Sacharok, Perloff, Dumont and Topham provided Liberty with information related to their care of Herbert.  (Def.'s SMF ¶¶ 10, 12, 16, 23.)  The records revealed the following timeline of events.

On September 26, 2012, Herbert saw Dr. Topham for a follow-up evaluation after her breast revision surgery in August.  (AR 211.)  Dr. Topham noted that Herbert had returned to work and had begun an exercise regimen, and that her "only complaint" was in regard to "left sided flank pain."  (*Id.*)  He noted in his assessment that her current symptoms are "likely from overdoing it with both returning to work as well as her exercise regimen."  (*Id.*)  He "cautioned her to tone down her exercise routine and to limit anything too aggressive," but did not otherwise restrict or limit her activity at work in any way.  (*Id.*)

On October 3, 2012, Herbert visited family practitioner Dr. Sacharok and complained of abdominal pain, bloating and nausea.  (AR 82.)  She also reported general complaints of fatigue and weakness, but did not report any other symptoms.  (AR 81.)  Her physical examination findings were normal except for diffuse tenderness in her abdomen and the sacroiliac joint in her pelvis.  (AR 83; Def.'s SMF ¶ 12(a).)  Herbert was advised to continue taking Prevacid for her reflux and was prescribed Zofran for her nausea and vomiting.  (AR 84.)  On October 6, 2012,

Herbert underwent a CT scan of her abdomen and pelvis, which came back normal except for diffuse liver steatosis and low density lesions within the left kidney. (AR 87–88.)

Herbert saw Dr. Sacharok again on October 8, 2012, due to worsening nausea and vomiting. (AR 89–94.) She reported that her nausea started first thing in the morning, persisted throughout the day and was exacerbated by movement. (*Id.*) Herbert reported that although food intake helped with the nausea, it caused reflux. (*Id.*) During her physical examination, Dr. Sacharok noted that Herbert reported mild pain/distress and that her abdomen was tender. He prescribed Reglan for her nausea and instructed her not to return to work until she felt less nauseous. (*Id.*) Dr. Sacharok wrote that the nausea "was probably trigg[er]ed by the stress of the surgery," and the abdominal pain could be a combination of irritable bowel, constipation and poor gastric emptying. (*Id.*) Two days later, Herbert contacted Dr. Sacharok to inform her that the Reglan helped her stomach, but it caused diarrhea and that she felt weak and lightheaded. (*Id.* 96–97.) She also reported that she started taking Lexapro, an antidepressant, but did not think that her symptoms were related to that. (*Id.*) Though Dr. Sacharok suggested that Herbert stop taking the Reglan, she decided to increase the dosage since it helped with the nausea. (*Id.*)

On October 15, 2012, Herbert visited Dr. Seedor at Taylor Hospital with complaints of nausea. (AR 59.) He reported that possible causes of the nausea were gastrointestinal or middle ear issues. (*Id.*) He recommended that Herbert undergo an upper endoscopy but did not place her under any restrictions or limitations. (*Id.*) The following day, Dr. Seedor performed the upper endoscopy and took random biopsies of Herbert's stomach to rule out occult gastritis. (AR 61–63.) The results of that procedure were "unremarkable." (AR 63.)

On October 19, 2012, Herbert was admitted to Taylor Hospital where she saw neurologist Dr. Kimberly Atkinson as well as Dr. Seedor. (AR 101–06.) Herbert reported experiencing

dizziness while reclining, which generally subsided when she sat up.  (*Id.*)  Dr. Atkinson reported

Herbert's physical, mental status, motor, sensory, and cerebellar examinations were all normal.

(AR 102).  Dr. Atkinson wrote that Herbert "experiences a constellation of symptoms with more

protracted episodes of nausea and vomiting . . . . [and] a dizzy type sensation when she lays

down that is alleviated when she sits up."  (*Id.*)  She added that "[i]t is difficult to piece together

these symptoms to have a neurologic etiology."  (*Id.*)

 During her admission to Taylor Hospital, Herbert underwent x-rays of her abdomen and

chest, which came back normal.  (AR 104–05.)  Herbert also underwent a cardiac evaluation,

including cardiac enzymes and an echocardiogram, with normal findings.  (AR 105.)  Doctors

believed that her symptoms were not due to any cardiac-related issue.  (*Id.*)  The treating

physicians recorded that they "do not have an answer for her symptoms but we can help treat

symptomatically."  (*Id.*)  On October 20, 2012, Herbert was discharged from Taylor with

diagnoses of (1) atypical symptoms of tingling in mid-back; and (2) nausea, vomiting and

dizziness.  (AR 104.)

 Herbert returned to Dr. Sacharok on October 23, 2012.  (AR 107–13.)  She complained of

fatigue, weakness, loss of appetite, indigestion, nausea, vomiting, gas, abdominal pain,

constipation, arthritis, difficulty with concentration, headaches, numbness, tingling, sensation of

room spinning, fainting and depression.  (AR 110.)  Dr. Sacharok noted during her examination

that Herbert reported that she had moderate pain/distress in her abdomen.  (*Id.*)  She instructed

Herbert to have a brain magnetic resonance imaging ("MRI") and ordered various laboratory

tests.  Herbert was also told to continue taking Reglan and Prevacid for nausea and reflux, to

restart Lexapro for her depression, and to follow a clear liquid diet for 24 hours and slowly

increase her diet as tolerated.  (AR 111–13.)

On October 26, 2012, Herbert underwent a brain MRI which showed a possible three-millimeter aneurysm.  (AR 117.)  Dr. Sacharok instructed Herbert to receive a magnetic resonance angiogram ("MRA") and follow up with a neurosurgeon for an evaluation.  (AR 117–18.)  Herbert subsequently received the MRA, which did not reveal any connection between the aneurysm and her nausea.  (AR 126.)  On October 30, 2012, Herbert spoke with Dr. Sacharok again to report continued nausea and dizziness.  (AR 119.)  When asked if the aneurysm could be the cause of her symptoms, Dr. Sacharok told Herbert that the radiologist stated that the aneurysm was not "in the correct area of her brain."  (*Id.*)

After a consultation with Herbert in the Neurosurgical Clinic at Thomas Jefferson University, neurologist Dr. Dumont wrote a letter on November 12, 2012, to Dr. Sacharok regarding Herbert's symptoms.  (AR 218–19.)  Dr. Dumont reported that Herbert's nausea could happen at any time of day and was sometimes associated with diarrhea or constipation.  (*Id.*)  He wrote that her "dizziness does not seem to be related directly to head movements[]" and that "[o]verall, her symptoms have improved substantially."  (AR 218.)  His letter also states that "she is no longer becoming dizzy, but does get cyclic nausea."  (*Id.*)  In assessing the aneurysm, Dr. Dumont stated that "the risks of rupture . . . are low . . . and the risks of treatment likely outweigh the risk of observation."  (AR 219.)   He recommended that Herbert undergo a follow-up MRA in six months.  (*Id.*)  He did not impose any restrictions or limitations on Herbert.  (*Id*; Def.'s SMF ¶ 24.)

On November 15, 2012, Herbert visited Dr. Perloff, the ENT specialist.  She complained primarily of dizziness, which she described as "imbalance" and the "room spinning."  (AR 145.)  Dr. Perloff noted that her pain is "not significant" and that she has "resumed normal activities."  (*Id.*)  Dr. Perloff performed an audiogram on Herbert, which revealed mild to moderate

sensorineural hearing loss.  (AR 146.)  He did not impose any restrictions or limitations on Herbert's activities, and recommended that she undergo an electronystagmography ("ENG") to help determine the reason for her dizziness.  (Def.'s SMF ¶ 16; AR 146–47.)  On November 28, 2012, Herbert underwent a videonystagmography ("VNG") instead of an ENG.  (Def.'s SMF ¶ 16.)  The test revealed a weakness in her left inner ear that was suggestive of peripheral vestibular dysfunction—a condition affecting the balance of organs in the inner ear.  (Def.'s SMF ¶ 16; AR 169.)

Herbert saw Dr. Sacharok again on November 30, 2012.  (AR 128–33.)  She told the doctor that she had no appetite but was forcing herself to eat, her reflux was still "bad" and she was no longer taking Reglan and Prozac but was taking Zofran and Valium.  (AR 128.)  She stated that those medications helped somewhat, but she was still experiencing nausea when laying down flat, which she thinks was because of dizziness.  She did state that sleeping in a sitting-up position helped with her nausea.  (*Id.*)  During her physical examination, Dr. Sacharok noted that Herbert said that she was in moderate pain/distress, her abdomen was diffusely tender, and her affect was depressed, though it had improved.  (AR 132.)  Dr. Sacharok did not impose any restrictions or limitations on Herbert.  (AR 128–33.)

On December 3, 2012, Herbert saw Dr. Perloff to discuss the results of the VNG.  (AR 178–82.)  Dr. Perloff noted that "the etiology of her symptoms is still unclear, and she does not report a significant spinning sensation.  However, I am treating her based on her positive ENG." (AR 180.)  He prescribed Meclizine and Prednisone for dizziness, but did not suggest any limitations on her activity.  (Def.'s SMF ¶ 16; AR 186–87.)  On December 11, 2012, Herbert contacted Dr. Sacharok with questions concerning the dosage of the Meclizine and Prednisone that Dr. Perloff prescribed.  (AR 134.)  She told Dr. Sacharok that she was "feeling better" with

8

these medications, was able to keep food down and was "not dizzy at all." (*Id.*) She reported that she sometimes felt nauseous, which she treated with Zofran and Diazepam. (*Id.*)

## C.

Upon receipt of the initial documents and information related to her claim provided by Drs. Seedor, Sacharok and Perloff, Liberty noted that Herbert suffers from "nausea and vomiting . . . precipitated by her dizziness/vertigo, but providers are still unclear on the etiology." (AR 4.) It suggested that Herbert's claim for LTD benefits should be reviewed by an independent neurologist and/or otolaryngologist. (*Id.*) Liberty also felt that Herbert's claim would be considered as a new claim rather than as a continuation of her breast reconstruction claim since the "issues do not appear to be successive to the prior claim for breast reconstruction." (*Id.*)

On January 4, 2013, Liberty received Herbert's completed LTD Application. (Def.'s SMF ¶ 20; AR 198–210.) Although Herbert returned the Attending Physician Statement with her signature on the authorization page, the form was blank— it had not been completed by a physician. (AR 207–08.) Herbert's Disability Claim Form stated that she had breast reconstruction surgery in May 2012 and a follow-up surgery on August 14, 2012. (AR 198.) It stated that she saw Dr. Topham on August 29, 2012, complaining of pain and nausea, and that Dr. Topham told her she pulled a muscle unrelated to the surgery. (*Id.*) Herbert also submitted an Activities Questionnaire, in which she represented that she could sit for one to two hours, stand for up to 30 minutes, and walk for up to 30 minutes. (AR 200.) Herbert also stated in the Questionnaire that she sits for 12–14 hours per day. (*Id.*) In response to a question asking what prevents her from engaging in gainful employment, Herbert wrote that she is "naseous [sic] every day must take meds every 6 hours – bile & reflux come up if not[.] Dizzness [sic] and nerve endings sensitive[.] Exhaustion from all activities." (AR 202.)

9

**D.**

After it collected her medical records and LTD Application, Liberty retained Dr. Alberto Ramos, board-certified in Psychiatry and Neurology, to review her file.  On January 21, 2013, Dr. Ramos submitted his report to Liberty.  (AR 224–29.)  He attested that he had "no significant past or present relationship with the Attending Physician, Referring Entity, or any other Care Provider previously involved in this case."  (AR 228.)  He also stated that his compensation for performing the review "is not dependent, in any way, on the outcome of this case."  (AR 229.)  Dr. Ramos's report detailed Herbert's medical history and the medical records submitted by her physicians.  (AR 224–26.)  He noted that she was diagnosed with left peripheral vestibular dysfunction, and that her symptoms improved after she began taking Prednisone and Meclizine.  (AR 224.)  Dr. Ramos's report also stated that he attempted but was unable to speak with Drs. Dumont and Sacharok.  (AR 226–27.)  Dr. Dumont's office told him that he would not speak with reviewing physicians by telephone and Dr. Sacharok did not return his multiple telephone calls.  (AR 227.)

Based on his review of the records, Dr. Ramos concluded that Herbert's symptoms were related to the vestibular dysfunction in her inner ear detected by the VNG.  (AR 227–28.)  He stated that when she was symptomatic, Herbert needed to limit the time she spent laying down, "which [would] not affect her work capacity."  (AR 227.)  "Otherwise, regarding her dizziness it would be reasonable that she would be restricted from climbing ladders, working on scaffolds and at unprotected heights, and operating heavy machinery and commercial vehicles."  (*Id.*)

Dr. Ramos reported that there is "no clinical evidence that [Herbert] has any restrictions or limitations regarding her gross motor function (e.g. bending, reaching standing, walking, and sitting), or her fine motor functions (e.g., keyboarding and typing, and manipulating[ ])."  (*Id.*)

10

He stated, however, that she should limit her physical exertion due to the risk of rupturing her brain aneurysm.  (*Id.*)  Based on this, and until a new MRI/MRA of her brain was done, Dr. Ramos opined that Herbert "would be restricted to lifting, carry[ing], pushing, and pulling no more than 20 pounds occasionally, up to ten pounds frequently, and up to five pounds constantly. There would be no other restrictions and limitations."  (AR 227.)  His opinion as to Herbert's restrictions and limitations was confined to her dizziness.  He opined that her dizziness was "unrelated to the gastrointestinal complaints of nausea, diarrhea/constipation and abdominal pain," and that any opinion as to those symptoms is "out of [his] field of expertise."  (AR 228.) After reviewing Dr. Ramos's report, Liberty determined that it needed to obtain an Occupational Analysis regarding Herbert's job functions, as well as an independent review from a gastroenterologist.  (AR 3–4.)

On January 28, 2013, Melissa Michuda ("Michuda"), Liberty's Vocational Rehabilitation Case Manager, provided her Occupational Analysis concerning the physical demands of Herbert's role as Branch Manager II as performed in the national economy.  (AR 242–45; Def.'s SMF ¶ 29.)  To write her report, Michuda reviewed Herbert's claim file, PNC's job description of a Branch Manager, the "Dictionary of Occupational Titles" ("DOT"), the "Occupational Outlook Handbook," and the "Occupational Information Network / Standard Occupational Classification coding system."  (AR 242.)

Michuda assessed Herbert's job description at PNC, which included directing all sales and service center activities, business development, and overseeing the acquisition and growth of the branch's workforce.  (AR 242–43.)  Based on those duties, Michuda established that Herbert's occupation is most comparable to "Manager, Financial Institution" as defined by DOT. (AR 243.)  According to Michuda, the DOT states that this occupation is performed at the

"sedentary" physical demand level with some positional requirements, such as "reaching and handling." (*Id.*)   Michuda also surveyed the "Occupational Outlook Handbook" and the "Occupational Information Network" before concluding that "the occupation of Manager, Financial Institution is typically performed at the sedentary and light physical demand levels." (AR 244.)  As defined by the Department of Labor, "sedentary work" involves "sitting most of the time," occasionally exerting up to 10 pounds of force, and walking or standing for brief periods.  (AR 245.)  It defined "light work" as occasionally exerting up to 20 pounds of force and frequently exerting up to 10 pounds of force.  (*Id.*)  Based on this, Michuda concluded that Herbert's job was "performed at the sedentary to light physical demand categories within the national economy."  (*Id.*)

On approximately February 5, 2013, Dr. Rakesh Vinayek, board-certified in internal medicine and gastroenterology, submitted a report discussing whether Herbert's symptoms could translate into restrictions on her work activities.  (AR 237–41.)  Dr. Vinayek stated that he had no "significant past or present relationship with the Attending Physician, Referring Entity, or any other Care Provider previously involved in this case."  (AR 240.)  He also stated that his compensation was not dependent on his opinion or the outcome of the case.  (AR 241.)  After reviewing Herbert's claim file, and after speaking with Dr. Seedor about his treatment of Herbert, Dr. Vinayek concluded that "there is no clinical evidence to support functional impairment, restrictions or limitations beyond 01/01/2013."  (AR 238–40.)  Dr. Vinayek noted that Herbert "has not followed [up] with the attending physician" since October 2012, and that Dr. Seedor did not place Herbert under any restrictions or limitations.  (AR 240.)  Dr. Seedor reviewed the report and confirmed that it accurately reflected the nature of their conversation, and that he "has not seen [Herbert] since her gastrointestinal work-up last fall and all the tests . . . were normal."

12

(AR 248.)  Dr. Seedor also stated that he believed that Herbert's symptoms were attributable to labyrinthitis, a condition often triggered by a virus that causes irritation and swelling in the inner ear, and for which she was treated with scopolamine.  (AR 248.)

### E.

By letter dated February 7, 2013, Liberty informed Herbert that she was not entitled to LTD benefits under the Plan.  (AR 250–52.)  The letter stated that she was not Disabled as defined by the Plan, which requires that the claimant is: (1) unable to perform the essential duties of her job for the first 24 months from the date LTD benefits begin; and (2) after 24 months, the disability renders the claimant unable to perform the essential duties of any occupation for which she is or can become qualified.  (AR 250.)  Liberty told Herbert that it reviewed the information provided by her physicians, "and then compared your restrictions and limitations to the requirements of your occupation."  (*Id.*)  The letter discussed the reports submitted by Michuda and Drs. Vinayek and Ramos and stated that "[b]ased on the medical information in relation to your occupation requirements, you do not meet your Plan's definition of disability, and we must deny your claim for benefits."  (AR 251.)

On August 5, 2013, Herbert appealed Liberty's denial of her request for benefits.  (AR 258–763.)  Though much of the files included in Herbert's appeal were duplicative of the information Liberty already received from her physicians during its initial review, Herbert did include files from visits with Dr. Sacharok that Liberty had not seen previously.  (AR 276–471; Def.'s SMF ¶ 46.)  Some of these new records included one from a January 15, 2013 visit with Dr. Sacharok which revealed that Herbert still experienced nausea, but was feeling "about 50% percent better than in Oct[ober]."  (AR 291.)  Herbert reportedly "felt great" when on steroids, and that "standing or sit[t]ing is not a problem[]."  (*Id.*)  Dr. Sacharok did not impose any

restrictions or limitations on Herbert's activity during this visit.  (AR 291–99.)  The file also included a record from a February 13, 2013 visit with Dr. Sacharok where Herbert reported that her "nausea worsens if she is upright for the day."  (AR 300.)

Herbert also included in her appeal file a July 25, 2013 letter drafted by Dr. Sacharok. The letter stated that she recently saw Herbert, who is "still having significant nausea, vomiting, abdominal pain and loss of appetite."  (AR 267.)  Dr. Sacharok wrote that Herbert is beginning physical therapy, but that "if she cannot resolve the abdominal pain she will not be able to return to work as a branch manager."  (*Id.*)  Along with the letter, Dr. Sacharok provided a report from Herbert's July 17, 2013 visit.  The report notes that the nausea and vomiting "continues to be an issue" and that Dr. Sacharok recommended physical therapy to "stretch abdominal muscles and stop muscle spasms."  (AR 273.)  Dr. Sacharok instructed Herbert to follow up in two months. (AR 274.)

Also new to the file was a Notice of Award ("Notice") issued by the Social Security Administration ("SSA") on July 30, 2013.  (AR 759–63.)  The Notice indicated that Herbert would receive monthly benefits effective March 2013.  (AR 759.)  It did not, however, indicate what materials the SSA reviewed in coming to its decision, or whether it drafted a separate letter or memorandum explaining its conclusion.  (Def.'s SMF ¶ 54; AR 759–63.)

In August 2013, Liberty referred the appeal to Susie Ratterree ("Ratterree"), a Nurse Care Manager in Liberty's Appeal Unit.  (AR 1–2.)  Ratterree reviewed Herbert's file and concluded that there was no basis on which to overturn Liberty's initial denial of Herbert's LTD benefits. She noted, in particular, that the file revealed Herbert's symptoms improved in January 2013, that she has discontinued or cut back on the medications used for nausea, dizziness, and anxiety, and that there is no indication that Herbert has "any type of [restrictions or limitations] related to

this condition."  (AR 2.)  In a September 23, 2013 letter to Herbert's attorney, Liberty summarized the information in the appeal file and stated its decision to uphold the denial of Herbert's LTD benefits.  (AR 767–72.)  The letter stated that "the additional information lacks objective findings to alter the opinion of Dr. Vinayek of January 22, 2013 or the restrictions or limitations identified by Dr. Ramos on January 21, 2013."  (AR 769.)  It further concluded that Herbert did not meet the Plan's definition of Disability because Liberty "determined that the records on file do not support that her condition was of a nature and severity that would warrant restrictions or limitations which would preclude her from performing her occupation."  (AR 771.)

## F.

Herbert filed this lawsuit on August 4, 2014 against Liberty and PNC.  (ECF No. 1.)  On September 17, 2014, she filed her Amended Complaint, naming the Plan as the only defendant in the case.  (ECF No. 4.)  Herbert's sole contention is that Liberty improperly denied her claim for LTD benefits under ERISA and that she is entitled to receive those benefits pursuant to 29 U.S.C. § 1132(g).  (*Id.*)  The Plan filed the Administrative Record on June 12, 2015 (ECF No. 22), and a motion for summary judgment on July 31, 2015.  (ECF No. 25.)  In its motion, it argues that Liberty's decision to deny Herbert's LTD benefits was reasonably supported by the claim file and was not arbitrary and capricious.  (*Id.* at 2.)  Herbert responds that Liberty's denial of benefits was not reasonable and the law does not impose on Herbert an obligation to provide objective evidence of the etiology of her condition.  (ECF No. 26.)

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). Summary judgment is granted where there is insufficient record evidence for a reasonable factfinder to find for the plaintiff. *Id.* at 252. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

When ruling on a motion for summary judgment, the Court may only rely on admissible evidence. *See, e.g., Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 95 (3d Cir. 1999). A Court must view the facts and draw all reasonable inferences in favor of the nonmoving party. *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

### III.

Under ERISA, courts review a denial of benefits "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, a court reviews a denial of benefits for abuse of discretion. *See id.; Funk v. CIGNA Grp. Ins.*, 648 F.3d 182, 190 (3d Cir. 2011).

The parties agree that the abuse of discretion standard governs the Court's review in this case.  (Def.'s Mot. for Summ. J. at 1–2; Pl.'s Opp. to Mot. at 2.)  In the ERISA context, this abuse of discretion standard is "essentially identical" to an arbitrary and capricious standard. *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 n.2 (3d Cir. 2011).  Thus, a court may overturn a plan administrator's denial of benefits only "if it is without reason, unsupported by substantial evidence or erroneous as a matter of law."  *Funk*, 648 F.3d at 190 (quoting *Doroshow v. Hartford Life & Accident Ins. Co.*, 574 F.3d 230, 234 (3d Cir. 2009)).  A decision is supported by substantial evidence if "there is sufficient evidence for a reasonable person to agree with the decision."  *Courson v. Bert Bell NFL Player Ret. Plan*, 214 F.3d 136, 142 (3d Cir. 2000).

## IV.

In the Third Circuit a plan administrator does not an abuse its discretion by requiring objective evidence that a claimant's condition is sufficiently disabling to warrant LTD benefits. *See, e.g.*, *Balas v. PNC Fin. Servs. Grp., Inc.*, 10-249, 2012 WL 681711, at *2 (W.D. Pa. Feb. 29, 2012); *Wernicki-Stevens v. Reliance Standard Life Ins. Co.*, 641 F. Supp. 2d 418, 426–27 (E.D. Pa. 2009); *Gibson v. Hartford Life And Acc. Ins. Co.*, 06-3814, 2007 WL 1892486, at *12 (E.D. Pa. June 29, 2007).  In *Balas*, the plaintiff suffered from fatigue and decreased cognitive function.  She sued her employer's disability plan after she was denied benefits.  2012 WL 681711, at *1.  The defendant argued that the decision to deny her claim was reasonable because plaintiff failed to demonstrate that her condition rendered her unable to perform the essential functions of her job.  *Id.* at *9.  The district court agreed, stating that it was not arbitrary and capricious for the plan administrator to require "objective evidence of her inability to perform the material duties of her regular occupation."  *Id.* at *10.

Similarly here, in order to establish a claim for LTD benefits, Liberty required Herbert to provide proof of a Disability that "makes you unable to perform the material or essential duties of your own occupation as it is performed in the national economy."  (AR 777–78, 786.)  Liberty denied Herbert's claim because she failed to provide any evidence suggesting that her nausea and dizziness prevented her from performing the essential duties of her job as a Branch Manager. (AR 251.)  Prior to Liberty's February 7, 2013 letter denying benefits, Herbert's physicians never limited or restricted her activities in any way or at any point stated that she was unable to work. (*See, e.g.*, AR 227–28, 236–41.)  Dr. Ramos stated in his report that there were no restrictions regarding her "gross motor functions (e.g. bending, reaching standing, walking, and sitting), or her fine motor functions (e.g., keyboarding and typing, and manipulating.)."  (AR 227.)  Dr. Vinayek similarly concluded that "there is no clinical evidence to support functional impairment, restrictions or limitations beyond 01/01/2013."  (AR 238–40.)  Accordingly, Liberty stated in its denial letter that the medical information provided "did not support an impairment that would impact [Herbert's] work capacity."  (AR 251.)  Under these facts, Liberty's decision was not arbitrary and capricious; to hold otherwise would require "the Court [to] substitute its judgment for that of the administrator."  *Balas*, 2012 WL 681711, at *10.

Herbert cites Dr. Sacharok's July 25, 2013 letter as evidence that she could not perform her functions as a Branch Manager if her nausea did not subside.  (Pl.'s Opp. to Mot. at 8.) Specifically, Dr. Sacharok wrote that if Herbert "cannot resolve the abdominal pain she will not be able to return to work as a branch manager."  (AR 267.)  Herbert submitted that letter as part of her appeal, and serves as the only "evidence" that she is unable to perform her tasks at PNC. Far from objective evidence—which is a term usually assigned to a vocational assessment or reasoned medical opinions, *see Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F. Supp. 2d

18

261, 297 (W.D. Pa. 2008)—Dr. Sacharok's statement is equivocal and conditional, and Liberty

does not have to give it substantial weight in assessing Herbert's claim.  *See Black & Decker*

*Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("[C]ourts have no warrant to require

administrators automatically to accord special weight to the opinions of a claimant's physician;

nor may courts impose on plan administrators a discrete burden of explanation when they credit

reliable evidence that conflicts with a treating physician's evaluation.").  Liberty instead

reasonably relied on Drs. Ramos and Vinayek's reports and Michuda's Occupational Analysis.

Michuda's report established that Herbert's role as a Branch Manager required sedentary and

light physical demands.  (AR 242–45.)  With the exception of more strenuous activity that could

risk rupture to Herbert's brain aneurysm, Drs. Ramos and Vinayek did not find any restrictions or

limitations that would limit her work activities.  (AR 224–29; 237–41.)

Those conclusions were reasonable and based on substantial evidence.  During the course

of her various visits to doctors in fall and winter of 2012, no physician ever placed any

restrictions or limitations on Herbert's activity and nobody said she could not work.  (Def.'s SMF

¶ 1–67.)  Herbert's medical history revealed that during a visit with Dr. Perloff on November 12,

2012, her pain was "not significant" and she had "resumed normal activities."  (AR 145.)  As of

January 2013, she reported to Dr. Sacharok that she was feeling "about 50% percent better than

in Oct[ober]."  (AR 291.)  During that same visit, she also reportedly "felt great" when on

steroids, and that "standing or sit[t]ing is not a problem[]."  (*Id.*)  In her claim submission, the

Attending Physician Statement—which contained questions regarding how her condition

affected her ability to work—was left blank.[2]  (AR 207–08.)  Herbert also submitted an Activities

---

[2]      The Attending Physician Statement contains questions regarding to the patient's "physical impairment,"
"mental/nervous impairment," and "cardiac impairment."  (AR 208.)  Each question contains options for the
physician to check stating the level of activity in which the patient can engage, as well as a space for "remarks."
(*Id.*)

Questionnaire stating that she could sit for one to two hours at a time, stand for up to 30 minutes, and walk for up to 30 minutes.  (AR 200.)  She reported in that same questionnaire that she sits for 12–14 hours per day.  (*Id.*)  Though the nausea and dizziness may have existed throughout 2013 and at the time of her appeal, there is no record of her receiving appropriate treatment under the continued and regular care of a physician as required by the terms of the Plan.  (AR 786.)

Herbert does not rely on the SSA's Notice of benefits as evidence in support of her claim. In any event, an award of benefits by the SSA is "relevant though not dispositive."  *Post v. Hartford Ins. Co.*, 501 F.3d 154, 167 (3d Cir. 2007), *overruled on other grounds by Estate of Kevin Schwing v. Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009); *see Hoch v. Hartford Life and Accident Ins. Co.*, 08-4805, 2009 WL 1162823, at *17 (E.D. Pa. Apr. 29, 2009) (declining to place "substantial weight" on the SSA's determination of Plaintiff's disability because "the SSA has very different guidelines for determining disability than does the Policy in this case"). Liberty stated in its September 23, 2013 letter denying Herbert's appeal that it "did fully consider the [SSA ruling]" but that such a decision was not "determinative of entitlement to benefits" under the Plan.  (AR 771.)  The SSA Notice contains no explanation for its decision or indication of what evidence it relied upon.  Liberty correctly states in its letter that, unlike the SSA, it does not need to give special deference to the opinions of a treating physician over the opinions of a non-treating physician.[3]  (AR 771.)  Further, the SSA award is only effective as of March 2013, and thus has limited relevance to Herbert's condition as of her LTD effective date of January 2,

---

[3]      In *Black & Decker*, the Supreme Court rejected the applicability of the "treating physician rule" in benefits determinations under ERISA.  538 U.S. 822, 834 (2003).  It recognized that the application of the rule in the Social Security context, unlike in ERISA cases, "grow[s] out of the need to administer a large benefits system efficiently." *Id.* (citing *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 804 (1999) (internal quotation marks omitted)).

2013.  Liberty therefore did not abuse its discretion in declining to give the SSA decision determinative weight in denying Herbert's claim.

Herbert cites to a series of cases that stand for the proposition that it is arbitrary and capricious for a plan administrator to require a participant to provide objective medical evidence as to the etiology of her condition.  (Opp. to Mot. at 9–11, *citing Mitchell v. Eastman Kodak Company*, 113 F.3d 433, 445 (3d. Cir 1997); *Heim v. Life Ins. Co. of N. Am.*, 10-1567, 2012 WL 947137 (E.D. Pa. Mar. 21, 2012)).  That argument, however, is misplaced.  Our Court recognizes a distinction "between requiring objective proof that the claimant has a condition with [requiring] objective proof that a particular condition is disabling."  *Wernicki-Stevens*, 641 F. Supp. 2d at 426 (internal quotation marks omitted).  Specifically, it is an abuse of discretion for a plan administrator to require a claimant to submit objective proof of the etiology of a medical condition; it is not an abuse of discretion to require the claimant to demonstrate how that condition renders her unable to perform the essential functions of her job.  *See id; Lamanna*, 546 F. Supp. 2d at 296 ("While the amount of fatigue or pain an individual experiences may be entirely subjective, the extent to which those conditions limit her functional capabilities can be objectively measured."); *Balas*, 2012 WL 681711, at *10 ("[C]ourts within the Third Circuit have held that is it not an abuse of discretion to require objective evidence that a condition, including chronic fatigue syndrome and fibromyalgia, is sufficiently disabling to warrant an award of LTD benefits."); *Boby v. PNC Bank Corp. & Affiliates Long Term Disability Plan*, 11-848, 2012 WL 3886916, at *17 (W.D. Pa. Sept. 6, 2012) ("Plaintiff was required to provide [the administrator] with objective evidence of the limitations resulting from his diagnoses which precluded him from performing his job as an RRA–II, which is a legitimate requirement."); *see also Tesche v. Continental Casualty Co.*, 109 F. App'x. 495, 498 (3d Cir. 2004) ("[W]e note that

the record, while noting a diagnosis of fibromyalgia, is devoid of any medical opinion that she is disabled from any occupation due to fibromyalgia.").

Defendant does not contest Herbert's symptoms and diagnoses: it recognizes that Herbert complained of, and may indeed have suffered from nausea and dizziness.  (Reply at 7.)  The issue is not that Herbert failed to prove that she suffered from a condition or that the cause of those symptoms is unknown, but that she failed to submit proof that her condition prevented her from performing the essential functions of her job.  Pursuant to the terms of the Plan and as permitted by the law in this Circuit, Liberty required Herbert to prove that her condition rendered her unable to perform the functions of her job.  (AR 786.)  It reasonably found that she failed to provide such proof.  Liberty's decision to deny Herbert's claim for LTD benefits was not arbitrary and capricious, and the Court grants Defendant's motion for summary judgment.

An appropriate order follows.

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.